ROBERT ROBINSON *et als.*, RESPONDENTS, *v.* THE IMPE-RIAL SILVER MINING COMPANY, APPELLANT.

LOCATION AND POSSESSION OF LAND FOR MILL SITE AND WATER RIGHT. Black & Eastman, in December, 1859, posted a notice on a tree on the bank of Carson River, of the location by them of a water right commencing at that point, and of a right of way for a ditch of a certain capacity to a rocky bend of the river below, and within the next six months did some fifteen or twenty days' work on the ditch but not sufficient to make it of any practical use; and they also erected a monument of stones at a point suitable for a mill site, on the river below the rocky bend; after which nothing further was done until October, 1860, when DeGroot entered: *Held*, not sufficient acts on the part of Black & Eastman to give them actual possession of the land traversed by the ditch, or of the mill site, nor to prevent DeGroot's entry and appropriation of them.

ACTUAL POSSESSION OF LAND—WHAT. The possession of public land necessary to be shown to enable a claimant relying solely upon prior possession to recover in ejectment, must be an actual occupation—a complete subjugation to the will and control, a *pedis possessio*. The mere assertion of title, the casual or occasional doing of some acts on the land, or the bare marking of boundaries, have never been held sufficient after the lapse of a sufficient time to make such inclosures or improvements as may be necessary to give actual possession.

STAININGER *v.* ANDREWS, (4 Nev. 59) to the effect that a person claiming public land should be deemed in the actual possession of all within his marked boundaries while diligently prosecuting the work necessary to subject it to his dominion or control, cited with approval.

APPROPRIATION OF RIGHT OF WAY, NOT AN APPROPRIATION OF A TRACT OF LAND. A notice of appropriation of a right of way for a water ditch is not sufficient as a notice of appropriation of the land upon the sides of it.

DIFFERENCE BETWEEN APPROPRIATIONS OF LAND AND WATER. Public land is appropriated by one character of act, water by another. The digging of a ditch,

Robinson *v.* The Imperial Silver Mining Company.

on public land is not an appropriation of land sufficient for a mill site, nor is the mere appropriation of a mill site an appropriation of water for milling purposes.

A DEED OF A WATER-RIGHT DOES NOT CONVEY A MILL SITE. A deed conveying all the water of a river between certain points "for the purposes and use of machinery or ditches, or for any other uses," does not convey the land of a mill site on the river.

TOWN SITE APPROPRIATIONS. A private survey for a town site was made of a tract of land, including certain premises claimed by other parties, and not as a part of the town site, which premises were not subdivided into lots like the balance of the tract, nor plotted on the map thereof, nor were they fenced or improved: *Held*, that the owners of the town site, though they might possess and own the lots subdivided, staked out and plotted by them without fencing or other improvement, they could not be held to have appropriated the premises not so subdivided, and had no possession of them.

FORCIBLE INTERRUPTION OF SETTLEMENT ON PUBLIC LAND. DeGroot, having entered upon certain public land under the Utah Statute of 1852 (Utah Stats. 1852, 175) and caused it to be surveyed, was engaged in fencing it, when he was forcibly driven off: *Held*, that by a compliance with the law so far as he could or was permitted, he acquired a title which entitled him to the possession of the land as against all persons except the government.

SURVEY FOR SETTLEMENT UNDER UTAH STATUTE. Under the Act of 1852, (Utah Stats. 1852, 175) requiring surveys for the purposes of settlement to be made by the County Surveyor, or survey made by persons employed by him and acting under his direction and certified by him, is sufficient.

CONSTRUCTION OF STATUTE—OFFICIAL ACTS BY EMPLOYEES. Where a statute (Utah Stats. 1852, 175) provided that "the County Surveyor shall within thirty days after completing any survey make true copies, etc.": *Held*, that a survey, not made by the officer personally but by persons employed by him and acting under his direction, if adopted as his act and certified to by him as such, was a compliance with the law.

PRESUMPTION IN FAVOR OF SETTLER INTERRUPTED IN HIS SETTLEMENT. In a suit for the possession of public land claimed by the plaintiff under the Utah laws, (Utah Stats. 1852, 175, and 1855, 271) where it appeared that he had entered in good faith, and had the land surveyed and was proceeding to fence it when the defendant forcibly drove him off: *Held*, that it would be presumed, even although the fence then being built was not of sufficient character, that an inclosure in all respects sufficient would have been completed.

NO ADVANTAGE OF ONE'S OWN WRONG. The law permits no person to profit by his own wrong.

FOREIGN CORPORATION CANNOT PLEAD STATUTE OF LIMITATIONS. Foreign corporations are within the exception of the Statute of Limitations as to persons absent from the State when a cause of action accrues against them.

CONSTRUCTION OF STATUTE OF LIMITATION. Section twenty-one of the Statute of Limitations, (Stats. 1861) in the use of the expression "cause of action," includes real action or actions as to real estate as well as personal action.

CHOLLAR POTOSI CO. *v.* KENNEDY, (3 Nev. 361) in so far as it expresses an opinion

that a foreign corporation is entitled to avail itself of the bar of the Statute of Limitations in an action concerning real property, disapproved and declared not the decision of the Court.

ERRORS NOT PREJUDICIAL. A judgment will not be reversed on account of error in an instruction to the jury, when it appears that the instruction could not possibly have injured the party complaining or misled the jury to his prejudice.

NO REVERSAL FOR ERROR WHERE JUDGMENT CLEARLY RIGHT. A verdict which is undoubtedly right upon the evidence, that is, so clearly right that if it were the other way it would be considered contrary to the evidence, should not be set aside because of the admission of improper evidence or the giving of incorrect instructions.

ON PETITION FOR REHEARING: VESTED RIGHTS UNDER UTAH SETTLERS' STATUTE— REPEAL OF STATUTES. The Statute of Utah Territory relating to settlements on public land (Utah Stats. 1852, 175; 1855, 176; and 1855, 271) which declared that in certain cases the Surveyor's certificate of survey should "be title of possession to the person or persons holding the same," gave to such certificate the character of a title as against all save the General Government; and after the laws had been complied with and a title obtained under them, the repeal of the laws could not destroy the title so acquired.

OBJECTIONS FOR DEFECT OF EVIDENCE NOT MADE IN COURT BELOW. An objection on account of a defect in the evidence, which would have been proper when the evidence was produced but might have been removed if then made, will not be allowed to be raised for the first time in the Appellate Court.

GROSETTA *v.* HUNT ET ALS., in so far as it expresses an opinion as to the necessity of filing a copy of survey with the Surveyor-General under the Statutes of 1852, (Utah Stats. 1852, 175) disapproved and declared not the decision of the Court.

FILING PAPERS IN RECORDER'S OFFICE—INDORSEMENT OF FILING. Where a statute (Utah Stats. 1855, 176) required a copy of a survey to be filed in the County Recorder's office, and a copy was produced therefrom with an indorsement by the Recorder that it was filed at the proper time, the fact that there was a further indorsement by him that it was recorded, which was not required: *Held*, not to vitiate the filing as required by law nor admit a presumption that it was merely filed for record.

CONSTRUCTION OF STATUTE—EXPRESSIO UNIUS, EXCLUSIO ALTERIUS. The second section of the Statute of 1852 (Utah Stats. 1855, 176) in regard to County Surveyors, required them to keep a record of all surveys made and of all certificates given by them, and especially provided that "no certificate shall be valid unless filed in the Recorder's office, as provided for in this Act": *Held*, that if a certificate was duly filed in the Recorder's office, the omission to do any of the other acts imposed by the section would not invalidate it.

CONSTRUCTION OF STATUTES—CERTIFICATE OF SURVEY. Where a certificate of survey, made under the Statute of 1855, (Utah Stats. 1855, 176) stated that the survey was made for a certain person, naming him: *Held*, that it was a sufficient compliance with the portion of the statute requiring the certificate to certify "to whom given."

APPEAL from the District Court of the Fourth Judicial District, Lyon County.

This was an action of ejectment, commenced on May 3d, 1867, by Robert Robinson, Willard B. Farwell, and William V. Wells, against the Imperial Silver Mining Company, —— Greentree, and —— McKay, to recover possession of a rectangular piece of land, two hundred and fifty yards from east to west, and three hundred yards from north to south, on the Carson River, in Lyon County, upon which was situated the Rock Point Quartz Mill, together with the mill and water flowing to it for its use, and twenty-five thousand five hundred dollars damages for the withholding of possession and use of the mill.   Subsequently and before the hearing, the action was dismissed as to the defendants Greentree and McKay, and the claim for damages waived.   The cause came up first before Judge Hayden of the Fourth Judicial District, but after a short investigation he determined that he was disqualified from trying it, by reason of an interest held by him in certain lots in the town of Dayton, embraced within the limits of the lands claimed by plaintiff; and at his request, S. H. Wright, Judge of the Second Judicial District, occupied the bench when the case again came up.   It was tried before a jury in August, 1867, and resulted in a verdict in favor of plaintiffs, for the land, property, and water rights, and costs of suit, upon which judgment was entered.   A motion for new trial on behalf of the defendant was overruled, and an appeal was then taken from the judgment and order refusing to grant a new trial.

It appeared that the Imperial Silver Mining Company was a corporation organized under the laws of the State of California, incorporated in 1863, since which time it had been in the possession of the premises sued for; and it was claimed that it had erected improvements on the ground at a cost of over a quarter of a million of dollars.

The record in the case is very voluminous, but all the facts, in addition to the foregoing, necessary for a full understanding of the decision, are stated in the opinion.

*Williams & Bixler*, for Appellant.

I.  The rules of law which must control the action of the Court in

its decision will be found in *Sankey* v. *Noyes*, (1 Nev. 68) where it is held that possession when solely relied on should be a *pedis vossessio*, an actual occupation, a subjection to the will and control; and in *McFarland* v. *Culbertson*, (2 Nev. 280) where this Court reiterates the doctrine of *Sankey* v. *Noyes*, and it is said with approbation·that the Courts have repeatedly held that to acquire title by possession to farming, or arable and meadow land, it must be inclosed by a substantial fence. In many cases it has been held that even a fence is not sufficient, but that the claimant must use and occupy the inclosed premises, or some part of them. (See, also, *Wright* v. *Whitesides*, 15 Cal. 47; *Garrison* v. *Sampson*, 15 Cal. 93; *Coryell* v. *Cain*, 16 Cal. 573; *Wolf* v. *Baldwin*, 19 Cal. 313; *Polack* v. *McGrath*, 32 Cal. 15; *Woodworth* v. *Fulton*, 1 Cal. 304; *Murphy* v. *Wallingford*, 6 Cal. 648; *Preston* v. *Kehoe*, 15 Cal. 315; *Cummins* v. *Scott*, 20 Cal. 83; *Hutton* v. *Shumaker*, 21 Cal. 454.)

From what has been said by this Court, and in other cases cited, it is clear that the least which can be required of one claiming public land by possession against another who has entered thereon, is that he, the claimant, was at the time of the entry in the actual occupation of the premises, using and holding the same and exercising such acts of ownership relative thereto as are usually and ordinarily exercised with reference to such property.

The same acts are not required in every instance, but must be such as are appropriate to the use for which the land was taken; and must, in all cases, amount to an open, notorious exercise of exclusive dominion and assertion of title to the premises. And it is further well settled that when all the facts of a case are before this Court it will determine whether they are sufficient in law to constitute possession. We do not understand *Staininger* v. *Andrews*, (4 Nev. 59) and *Sharon* v. *Davidson*, (4 Nev. 416) as holding a different doctrine.

But it is claimed that the entry of Black and Eastman excused Johnson from any further acts necessary to complete his possession, and *Alford* v. *Dewin* (1 Nev. 207) was cited as sustaining the proposition. The greatest length to which that case can be construed as going is, that when the law requires a series of acts to vest

title to land, and one who proceeds in good faith to perform such acts is prevented by another from doing any one or all of them, then as against the latter, he will be presumed to have filled the requirements of the law—that is to say, the attempt, in good faith, to perform the act, will be taken for its execution. Such is the law, but we cannot see how that rule is to be extended to this case.

Johnson was not acting under the provisions of any statute upon the subject, but was attempting to acquire title, if at all, under the general rules of law relating to possession, which are about the same throughout the United States when applied to the use of public lands. He had no right to stop and rest upon a few disconnected, uncertain acts which did not give him possession, because others were attempting to acquire title to a part of the land claimed by him under the same rules of law which it is supposed he was acting under, and offer as an excuse for not attempting to perfect his title those attempts of others. If such an excuse for non-action should be allowed by the Courts, then the development and progress of the country would be greatly retarded. No man would dare enter upon land upon which a notice or blazed tree could be found, from an apprehension that he who posted the notice or blazed the tree; or an enterprising grantee of his who dealt in stale titles and *other old wares* might, after the lapse of years, oust him and take his improvements as well as the land.

To perfect title by possession to a given tract of land one must do all in his power to reduce it to his exclusive dominion, and if obstructed in regard to a part of it, he must occupy what he can, and continue to assert in an appropriate manner his claim to the whole. Unless he continues to occupy a relation to the whole tract which would justify his recovery of any part of it against all intruders, he cannot recover any of it, except that which he has the actual possession of, and that possession must be the *possessio pedis*. In other words, before ejectment can be maintained the plaintiffs must show actual or constructive possession of the premises sued for at some time. Actual possession consists in having reduced to his exclusive dominion the particular piece of land; constructive possession in having the dominion of part with a proper assertion of title to the remainder, or attempted and prohibited dominion of it.

As to DeGroot, it appears that he employed one McMurray to survey for him the land described in his deed from Johnson. McMurray was an employé of Marlette, County Surveyor, and Marlette certified the survey. Williams, a selectman, approved it, and the Recorder of the county placed it on record. Black and Eastman for themselves, and Collins for the Mineral Rapids Company—each claiming possession of parts of the land surveyed—attempted to prevent the survey, and drove DeGroot off. This survey was not an act of possession, or such an act as would give or tend to give title by possession; it was not so intended, but on the contrary, seems to have been an effort to conform to the Utah statutes, and to secure by virtue of those statutes a title for one year. Then if we attach this to all past acts of DeGroot and Johnson, and admit that each act followed its predecessor in due and reasonable time, we find there is yet a complete failure to come within the rules of possession so as to confer title.

If that survey conferred any right whatever, that right commenced with the completion of the survey. We find, however, that Black and Eastman were then in the actual possession of the premises in controversy, and we presume that no one will claim that the Utah statutes intended to give or could give title by a mere survey against one in possession at the time of survey. Black and Eastman were there by consent and license of the Federal Government in which the fee rested, and it was not within the power of the Utah Legislature to confer authority upon another to oust them. If allowed the full force of all that is claimed for it by respondents, the Utah Acts referred to were calculated to work hardships to individuals and greatly retard the progress of the country, for it is said that an unlimited quantity of land could be embraced within a survey, and that no other act was necessary to give title for one year. If such construction may be given to the law, then the Courts ought to be very strict in its application. One claiming by such title should be required to come within both the letter and spirit of the statute. The Utah statutes only attempted to attach the rights claimed by respondents to a survey made by the County Surveyor. This was not made by the County Surveyor, or even by a deputy of his, but by an unsworn, unauthorized citizen, whose

Robinson *v.* The Imperial Silver Mining Company.

acts were no more binding upon the Government or its citizens than those of any other private person; and although the statute says that the certificate of the Surveyor " shall be title of possession," yet it is clearly contemplated that an *actual survey* shall first have been made by a competent officer.

The object of requiring an actual survey was that monuments of such a character should be erected or established upon the land as would attract attention and put all persons desiring to occupy it upon inquiry concerning title to the same. If such survey was not required and an actual occupation of the premises was not necessary to acquire title, then the community would have been constantly liable to become unconsciously trespassers.

Again: There is some conflict of authority relating to the power of an officer to appoint a deputy unless thereunto authorized by law; but there certainly can be no question that acts in their nature official performed by one who is neither an officer elected, appointed or commissioned, are void. As DeGroot's survey was not made by an officer recognized by law, we claim that it did not confer any right upon him.

If, however, we admit that the survey was made, certified and recorded as required by law, and that at the time it was made there was no adverse possession by Black and Eastman, respondents still fail to establish a title to the premises sued for. The Utah statutes, under which they claim, required them to fence the land within one year, and declared that a failure to do so should work a forfeiture of all right acquired by the survey. DeGroot and his grantees failed to build the required fence, but they allege as an excuse for their failure, that they were forcibly prevented from doing so by Black, Eastman, and others. This excuse cannot be counted to their credit unless the acts which Black and Eastman prevented would, if completed, have perfected their title.

From the evidence, it appears that the fence which was built, was made by planting posts eight feet apart and nailing to them two boards, each eight inches wide, and that the intention was to make the entire inclosure in the same manner. Let us suppose that they had carried out their intention by building the kind of fence mentioned around the entire tract, would that have given them title

either  under  the  common  law  rule  of  possession  or  the  Utah
statutes ?    The  authorities  heretofore  cited  and  a  fair  construction
of  the  Utah  statutes  clearly  justify .and  require  an  answer  in  the
negative.    A  fence  of  the  kind  they  were  building  would  no  more
have  reduced  the  land  to  their  exclusive  dominion  and  possession,
than  the  mere  planting  of  stakes  or  the  blazing  of  trees.

In  concluding  this  branch  of  the  case  we  call  the  attention  of  the
Court  to  the  question  whether  the  Utah  statutes  relative  to  lands,
by  virtue  of  which  respondents  claim  title,  furnish  the  proper  rule
of  decision  for  this  controversy.    The  Territorial  Government  of
Utah  had  no  power  to  dispose  of  the  public  lands  within  the  Terri-
tory,  nor  to  give,  grant,  or  vest  any  interest  therein.    The  full
extent  of  the  power .of  that  Government  was  to  fix  the  rules  which
should  govern  in  her  Courts  in  actions  between  her  citizens  respect-
ing  land  or  other  property.    The  Utah  Legislature  could  not  pass
laws  affecting  the  *right*  to  land,  but  had  the  power  to  declare  the
*remedies* which  should  pertain  to  the  same.    It  could  not  say  that
certain  acts  should  confer  *title* to  land,  but  had  full  power  to  declare
the  circumstances  under  which  the  plaintiff  or  defendant  in  a  given
character  of  case  should  *recover* in  the  Courts  of  the  Territory.

If  we  are  right  in  holding  that  the  Utah  statutes  spoken  of  per-
tained  merely  to  the  *remedy*, then  with  the  repeal  or  abrogation  of
those  statutes  fell  the  right  to  claim  under  them  in  the  Courts  of  the
country.    On  the  twenty-first  of  March, 1861,  the  Congress  passed
the  Act  organizing  the  Territory  of  Nevada.    Upon  the  passage  of
that  Act  the  statutes  of  Utah  ceased  to  operate  within  the  limits  of .
the  new  Territory.    As  a  consequence  those  attempting  to  hold
lands  within  Nevada  Territory  by  Utah  *survey title* were  compelled
to  enter  into  actual  possession  of  them  or  forfeit  all  claim  thereto.
The  respondents  did  not  take  such actual  possession  and  did  no  act
whatever  with  relation  to  the  land  in  controversy  until  their  attempt
to  fence  in  the  fall  of  that  year,  making  a  period  of  six  months,
running  through  the  entire  farming  season,  during  which  they  failed
to  assert  title  to  or  enter  upon  the  premises ;  hence  if  they  ever  had
any  right to  it  they  lost  it  then.

II.    The  usual  mode  of  appropriating  water  is  by  notice,  followed
by  laying  out  a  ditch  or  canal,  and  within  a  reasonable  time  there-

after constructing such ditch or canal and diverting the water into it. If it is desired to build a mill in connection with the ditch, the usual custom is to indicate by notice, or monuments, or stakes, the site of the mill. In December, 1859, Black and Eastman located the ditch and mill site now owned and occupied by appellant, by posting notices at the head of the ditch and the mill site. They surveyed out their ditch and piled up stones as monuments at the mill site, to indicate the location of their mill, and soon after commenced the construction of their ditch. They pursued the work far enough during the season of 1860 to divert the water of the river, and the following season completed the entire undertaking and commenced operating their mill. Having regularly followed one act by another within a reasonable time, until the completion of the ditch and mill, their rights related back to the first act, and hence their title dates in December of 1859, and it must be held good against all claims attempted to be *secured* subsequent to that date. We have heretofore shown that at the time named Johnson had not even the shadow of a title.

Again: The Mineral Rapids Company located the same land in February of 1860, for a town site. They leased a part of it to be actually occupied by one of the company, and laid the entire tract off into town lots, streets, etc., and staked and mapped the whole in the usual and ordinary mode of laying off towns. We submit that as they occupied the land in the appropriate manner of occupying lands for such purposes, they acquired title to the whole town site except that portion of it then in the actual possession of Black and Eastman, whose better right they acknowledged. As against Johnson the Mineral Rapids Company had the better title, and we have succeeded to all they had. So far as the water right goes, there can be no question but that the Mineral Rapids Company acquired a perfect title, or as perfect as possession could make it.

III. The second instruction was wrong. It is subject to the objection that no qualification was made in favor of those in the adverse possession of the land surveyed, at the time of survey. The jury were left to conclude, and, by the import of the instruction, given to understand, that a survey made, certified, and recorded, as required by the Utah laws, gave title for one year against all

persons without regard to the time, manner, or circumstances of their entry.   That there was some peculiar efficacy about a survey and observance of Utah laws and customs which gave a sanctity to a right claimed under them, above and superior to one obtained in any other manner; that the effect was to do away with all previous efforts to secure title to the tract thus honored.   As we claimed by possession taken previous to and existing at the time of DeGroot's survey, the Court ought to have qualified this instruction by declaring that such a survey could not operate to give title as against one who had previously located the surveyed land and was then in its actual occupancy.

IV.   The Court gave the third and fourth instructions offered by respondents, and refused the seventh, asked by appellant, upon the theory that a foreign corporation is not entitled to the benefit of our Statute of Limitations.   Whether the action of the District Court upon this subject was correct or not is a matter of serious debate. Mr. Justice Beatty, in *Chollar-Potosi Company* v. *Kennedy*, (3 Nev. 361) made a strong argument on our side of the question. We do not believe that a foreign corporation can plead the statute in personal actions, but after careful consideration are disposed to agree with Judge Beatty in reference to the application of section twenty-one to actions concerning real estate.   There are strong reasons why the exception embraced in that section should apply to personal claims, but none for its application to actions pertaining to realty.

A judgment for a personal demand should be based upon personal service of summons that it may be made available beyond the limits of the State, while *substituted* service is as effectual as actual service in actions for the recovery of real property.   Why then make the *mode* of service rather than the relation of the parties to the property in real actions control the *time* of their commencement ? Judge Beatty also suggests, correctly, that ejectment may be maintained against any one in possession, whether master or servant. He might have added that it can only be maintained against the party in possession.

Now, then, we are told that a foreign corporation cannot exist beyond the limits of the State within which it is created, and there-

fore can never be within this State, or, in the language of the Limi-
tation Act, is "always absent from the State." If the proposition
be true, then how can such a corporation eject a party, and actually
possess the land entered upon ? It seems to us that respondents'
argument cuts both ways, and that they must either admit the
appellant *in the State*, and therefore in possession of the premises
they sued for, or else out of the State, and therefore incapable of
ejecting them. If the first, the Act of Limitations applies, or if the
second, the complaint does not state a cause of action.

*Mesick & Seely*, for Respondents.

I. We claim that upon the whole evidence *the verdict is right*.
The jury decided the case after a patient and protracted hearing
of a great mass of testimony, oral and documentary, which, in many
of its features, was conflicting, and some of which, by reason of such
conflicts, had to be qualified or entirely disregarded. This Court
will not disturb that verdict, except on manifest error shown affirma-
tively by the appellant, and but for which the verdict should have
been for the appellant. If the verdict appears right upon the whole
case, it will not be disturbed on appeal.

We assume the privilege of basing our right upon any fact within
the record sufficient to support it, and we especially rely upon the
certificate of survey of the County Surveyor of Carson County to
DeGroot, our grantor, dated November 5th, 1860, upon a survey
made October 30th and 31st, 1860, which covers the land in ques-
tion in this suit. At the time this survey was made and certificate
given, the statutes of Utah (Utah Stats. 1855, 175) provided that
the County Surveyor should give a certificate of such survey to the
person for whom it was made, describing the tract, block, or lot, and
number of acres contained ; and such certificate should be "title of
possession to the person or persons holding the same." The Utah
statutes further provided (Utah Stats. 1855, 271) that the Re-
corder should not record any land to any person until a certificate
of the survey had been procured that such land had been surveyed,
and such certificate of survey had been approved and countersigned
by one or more of the Selectmen of the county, and that "one
year shall be allowed to persons having land surveyed to inclose

and fence said land." And in *Alford* v. *Dewin*, (1 Nev. 207) this Court gave force and effect to these Utah statutes, and established the right of recovery under the certificate directed by these statutes to be given. See also *Desmond* v. *Stone*, (1 Nev. 378) to the same effect. There was a substantial compliance on the part of DeGroot with the Utah statutes as to all acts to be done for the acquisition of the right of possession and transfers of interest. The legal effect of the certificate was to endow DeGroot with the title of possession—that is, the possessory right or title—for the period of one year, without any act being done on his part. Black and Eastman, from whom appellant derives its right, took possession of the land in controversy and ousted DeGroot within the year after the survey; and afterward, in August, 1861, when the then owners of the DeGroot interest undertook to inclose and fence the land, they were forcibly prevented by Black and Eastman and the Imperial Silver Mining Company.

This ouster of DeGroot and the prevention of the fencing of the land, caused by Black and others under whom defendant claims, form a valid excuse for not fencing within the year, and estop the defendant in this controversy from availing itself of the objection that the land was not inclosed within that period. (*Alford* v. *Dewin*, 1 Nev. 207.) And ever since that time DeGroot and his successors in interest have been kept out of the possession of the land by defendant and those under whom it claims. This would, upon the merits of the case, seem to justify the verdict beyond all question.

II. The law does not say that the survey must be made by the Surveyor in person, nor how it shall be made. (*Alford* v. *Dewin*, 1 Nev. 207.) But this certificate is itself evidence of the facts which the law directs the Surveyor to certify.

The testimony of Marlette shows that though *he* did not make the surveys, they were made by his order and direction and by his assistant; and upon such acts as his own he issued the certificate. The manual labor, within no rule, was required to be done by him. He had a right to act by agents and employés—everything being done in his name and by his direction, and he adopting—and being responsible for such acts as his own, done in the performance of

his official duties.   The law directs certain records to be made, and copies to be given by certain officers.   May they not have the writing done by any employé, without invalidating the official act in which the writing is used ?   The objection under consideration, if allowed, would upset four-fifths of all official acts performed.   This certificate, like a patent, imports verity, and is binding on third parties.

III.   As to the next objection it is sufficient answer to say, that the laws of Utah were the laws of the United States as much so as if they had been made by Congress itself, or by Commissioners appointed by Congress ; and that, upon the plainest principles, the organization of the territorial government of Nevada did not put an end to either remedies or rights given by the Utah statutes. But this permission to occupy public land, and prohibition against intrusion, decreed by the statute, was a right—not in the land, but over it—subordinate certainly, and only subordinate, to the will and subsequent acts of the Government of the United States, or of some other territorial government which Congress might depute over the same territorial area.

The Courts of Nevada Territory always recognized and enforced the Utah laws, until changed by territorial legislation or congressional action, and upheld rights and redressed wrongs thereunder.

IV.   As to the next objection the Court, in the case of *Alford* v. *Dewin*, has made answer for us : " That before the expiration of the year, the defendants [or its grantors] had entered," and that " the plaintiffs [or their grantors] being wrongfully ousted, could not fence."   It does not lie in the mouth of Black, or of defendant, to say that if the plaintiffs had not been prevented they would not have made a sufficient fence.   So far as defendant is concerned, plaintiffs were not bound to fence at all under the circumstances : their right was good without any fence ; and it would seem strange, if an effort to make a fence of any kind about the premises could place them in any worse position.

Again : There could not have been and there was no evidence that a sufficient fence would not have been built within the year, but for the interference proven.

V.   As to the objection that Black and Eastman were in actual

possession of the property when the survey was made, it is plain that their acts and those of the Mineral Rapids Co., done within the same period of time, constituted no possession, and also left the property vacant at the time of the survey, and open and susceptible to appropriation by the survey and certificate to DeGroot, made under the Utah statutes.

If the acts of Black and Eastman and the Mineral Rapids Co., done before the survey, were sufficient to give them a right to the property, and the property was therefore not vacant, then so were the acts done by Johnson and DeGroot; and the latter took precedence of the former, because the location of Johnson, to which the acts of himself and DeGroot related, were first in time; and Black and Eastman, and the Mineral Rapids Co., and the Imperial Co., had knowledge of such priority. But if the acts of neither were sufficient to possess the property, then the same was vacant when the survey was made, and the title of possession, or the possessory title thereto, was conferred upon DeGroot by the certificate of survey. (*Sankey* v. *Noyes*, 1 Nev. 68; *Ophir Silv. Min. Co.* v. *Carpenter*, 4 Nev. 534; *Staininger* v. *Andrews*, 4 Nev. 59; *Sharon* v. *Davidson*, 4 Nev. 416.)

VI. If the certificate of survey to DeGroot, which is the foundation of our right was valid, the verdict was correct and could not have been different, notwithstanding all acts antecedent to the survey and rulings and instructions of the Court in reference thereto. Even if such acts were irrelevant or incompetent to sustain a right of recovery, and if the rulings of the Court in relation thereto were erroneous—still, upon the certificate alone and the undisputed evidence having relation thereto, the right of the plaintiffs was perfect, and the verdict could not have been for the defendant.

When the Court can see from the whole record that the verdict is right, it will not be disturbed, notwithstanding the existence or errors which, being corrected, the verdict would remain the same. (*Terry* v. *Sickles*, 13 Cal. 429; *Clark* v. *Lockwood*, 21 Cal. 220; *Belmont* v. *Coleman*, 1 Bosw. 188; *Kelly* v. *Hammer*, 18 Conn. 311; 1 Grah. & W. on New Trials, 301; 2 Grah. & W. on New Trials, 634; 3 Grah. & W. on New Trials, 968; *Levitzky* v. *Canning*, 33 Cal. 299.)

VII.   As to the second instruction, the qualification, suggested by appellant, ought not to have been added to it, because the proofs showed that no one was in possession of the land when the survey was made and certificate given.   For the same reason the Court properly refused to give defendants' sixth instruction.

VIII.   Does section twenty-one of the Statute of Limitations include foreign corporations within its meaning ?   We insist that this question is settled by the case of *Olcott* v. *The Tioga Railroad Company*, (20 New York, 210) reversing the case as decided in the Supreme Court of that State, (26 Barb. 148) and overruling the case of *Faulkner* v. *Delavan & R. C. Co.* (1 Denio, 441).   The doctrine settled in the above case by the Court of Appeals of New York, upon great consideration, all the Judges concurring, and after the most elaborate research and argument of eminent counsel, is that : " a foreign corporation sued in this State cannot avail itself of the Statute of Limitations.   It is like a natural person, within the exception to the operation of the statute, by which the time of absence from the State is not to be taken as any part of the time for the commencement of an action against it."   No one denies that as to natural persons and personal actions, this section twenty-one means as it reads, that is, that under its provisions the aggregate of all a defendant's absence from the State, is to be taken into view in determining the time limited for commencing the action ; and that a defendant who pleads the statute, is bound to prove that deducting each interval of his absence, that is, the aggregate of all the absence from the State, he was within the State the full statutory time.   That as to personal actions, foreign corporations are within the exception, is fully established by the case above cited, and it is not controverted by counsel for appellant.   It being then both decided and admitted that the exception of the section applies alike to all parties to actions, whether they be natural or artificial persons, why does it not likewise apply to every class of actions mentioned in the statute, whether the subject matter of the action be the recovery of money, or of the possession of goods and chattels, or of real property ?

It seems to us plain that there is less ground and pretext for holding that actions for real property are not within the meaning of

————— section, than there is or ever was for holding that foreign corporations are. This is apparent from the language of the section, and its connection with other sections of the statute immediately preceding and following it. The language of all these sections is general, and there is no warrant for applying them to only a portion of the actions mentioned in the statute—there is no room for an equitable construction, or any construction to be put upon them, for the meaning of the words used is not doubtful, and that meaning is in perfect harmony with the apparent purposes and meaning of the balance of the Act.

On petition for rehearing—

*Aldrich & DeLong* and *Williams & Bixler*, for Appellant, after the first decision, filed a petition for rehearing, in which the principal points urged—and which are, for the sake of convenience, inserted here—were as follows:

I. To ascertain whether the laws of Utah Territory, under which DeGroot claims, are in the nature of a contract, or in their nature remedial, let us suppose that the last one, which requires the inclosure within a year after the survey, had not been passed. In that case the survey, if the laws are in the nature of a contract, would give title of possession, or, in other words, the right of possession, to any person having a survey made, until the disposal of the land by the government of the United States, notwithstanding a new territorial government, embracing the land, had been organized out of a portion of the Territory of Utah, and an independent State government, embracing the same land, had been organized, and the laws of Utah had been by implication of law entirely abolished. No State or Territory can pass any law to impair the obligations of a contract, and if it be said that the organization of these governments was really the act of Congress, on whom no such restraint has been imposed, the answer is, that Congress has not only impaired, but abrogated, the contract, and the parties affected must suffer by the exercise of the power. If the laws then are in the nature of a contract, to use a favorite Mormon expression, the laws of Utah will have been " perpetuated " on the Territory and State of Nevada.

This continuation of the right claimed in this case cannot be seriously contended for. The fact that by subsequent law the person holding the survey was required to inclose within a year does not at all change the principle which we are attempting to support.

Our positions, then, are that the rights which DeGroot acquired, if any, by his survey, were of that description which depended for their vitality upon statutes in their nature remedial; that these statutes have been repealed by the organization of the Territorial and State governments of Nevada, and by the legislation under these governments; and that these rights and the right of action were lost by the repeal.

II. The survey in evidence was not made and certified according to the laws of Utah. In *Grosetta* v. *Hunt*, (recently decided by this Court) it is held that there must be a strict compliance with these laws by a person who wishes to avail himself of the benefits of a survey made under them. These laws provide that true copies or diagrams shall be made out by the County Surveyor, and that within thirty days after the survey he shall transmit one to the Surveyor-General, one to the County Recorder, and that he shall give a certificate of such survey, describing the tract and number of acres contained, to the person for whom it was made. In *Grosetta* v. *Hunt*, this Court says: "Here it appears that to give title of possession, three things are to be done after the survey is made: First, one copy of the survey is to be transmitted to the Surveyor-General's office; second, another copy to the Recorder; third, a certificate of such survey to the party for whom the survey is made." It is not shown that any copy of the survey was transmitted to the Surveyor-General's office, or that more than one copy was ever made out, and this copy, as will be shown hereafter, was not filed, except for record, and afterwards withdrawn. The Act of 1852 contemplated the *filing*, not recording, of these certificates. If the law requires a paper to be filed in any one of the public offices, no one is bound to look in the records proper to find it. The record of it is no notice. The Act further requires that the survey and certificate should be recorded in the office of the County Surveyor. There was no proof that DeGroot or his successor in interest ever com-

plied with this provision of the law, which was undoubtedly intended to afford an additional protection to the public in the appropriation and improvement of the public lands.

Again, the law requires that the certificate should state the number of acres or rods contained .in the survey, and to whom given.   There is nothing stated in the certificate as to the person to whom it was given.   It may be said that this is unimportant, but is it not just as important to the public, as that they should be informed as to whom a deed had been given ?

III.   The defendant, for the reasons above stated, is a *bona fide* purchaser of the property in dispute, without notice of any claim on the part of DeGroot or his grantees.   Admit that DeGroot's survey gave him the " title of possession," to use the words of the law, and that he was prevented from fencing the premises by reason of the opposition of Black and Eastman, how can it affect the present defendant ?   The object of requiring these surveys to be filed, as declared in *Grosetta* v. *Hunt,* was to enable persons who desired to locate public lands, by looking at the files, or where required to be recorded, at the records, in any one of the offices designated, to ascertain whether the lands about to be located had been previously appropriated.   An examination of the files or records with respect to the claim of DeGroot would have disclosed the fact, if 'the defendant happened to look in the one office in which there is any trace of this survey, that DeGroot had a survey, but that the time within which that survey would afford him . protection had elapsed. The defendant could have had no means of ascertaining from any one of the public offices the existence of any claim on the part of DeGroot.

By the Court, Lewis, C. J. :

In the month of September, A.D. 1859, one W. R. Johnson entered upon a tract of unoccupied land, lying on the Carson River, in the county of Lyon ; erected some kind of a cabin . on the premises ; placed a notice on a tree on the bank of the river, in which it was stated that he claimed a certain quantity of land, and also the water of the river ; and on the twenty-third day of the next month he had a description of his land,

with a notice that he claimed the same, recorded in the office of the County Recorder. In addition to this he built a temporary dam across the river, within the boundaries of the land thus claimed by him: Shortly after—that is in November or December—he left the premises and went to California, as it was reported, for his family, intending to bring them to this State. In a few weeks after reaching California he wrote to one Holmes, who was living near his claim, requesting him to do some work on it for him, without specifying what he wished done—his object, however, evidently being to have work done to indicate his intention to continue his claim to the land and water privilege.

But the persons from whom the defendant derives title, and who were then making some claim to the premises, being informed of this letter, forbade Holmes doing any work for Johnson—and none was done. Whether Holmes was deterred from complying with Johnson's request by reason of the threats of those persons or not, or whether he ever had any intention of doing anything, is not clearly shown by the record; nor in the view which we take of this very case is it of any consequence. Nothing further appears to have been done by Johnson to perfect his claim thus begun; but what he acquired, if anything, was subsequently conveyed to one DeGroot, who afterwards secured a title to the premises here in dispute, by means of a survey made in accordance with statute. We have concluded to treat the acts of Johnson, and the conveyance by him to DeGroot, as amounting to nothing, and as giving the latter no right whatever—and so to let the plaintiff's title rest entirely upon the acts of DeGroot. Thus, it will not be necessary to refer further to the acts of Johnson, or to determine what rights, if any, he acquired by means of the few acts done by him. He and his title may therefore be finally dismissed from further consideration in this case.

On the third day of December, whilst he was in California, two persons, Black and Eastman, took steps to acquire a water privilege, or a right to divert a certain quantity of water from the Carson River, through a ditch to be dug across the land claimed by Johnson. As one of the titles relied on by the defendants is derived from these two persons, and as their right or title was based entirely

upon occupation or actual possession, it will be necessary to ascertain whether they had such actual possession or occupation of the premises in dispute, at the time the grantor of the plaintiff entered and secured a title by means of his survey: If the acts done by Black and Eastman, prior to this survey, were such as to give them actual possession of the land here claimed by the plaintiff, then it must be conceded that the defendant has the better title, and is entitled to recover.

The first act done by Black and Eastman was to post a notice on a tree standing on the bank of the river, which was in this language : " Notice is hereby given that we, the undersigned, have this day located a water right, commencing at or near this notice ; also a right of way for a ditch of sufficient capacity to carry two thousand inches of water ; and the same amount of water—that is, ' two thousand inches,' is claimed to fill a ditch of the aforesaid capacity. Said water to be carried in said ditch to the first rocky bend with high banks, about one-fourth of a mile down the river from this notice. Said water and ditch right was located by the undersigned on the third day of December, A.D. 1859. The undersigned intend to prosecute said work as soon as spring opens." This notice was signed by Black and Eastman. The valuable portion of the premises—that is, the mill site, is situated below the point here specified as the terminus of the contemplated ditch, and where it was in fact terminated—the mill site being at the lower side of the " rocky bend " mentioned in the notice, whilst the ditch terminated at the upper side. It will be observed, that there is nothing said in this notice about a claim to land, except a right of way for a ditch. In accordance with this claim, and the intention expressed in the notice, Black and Eastman immediately commenced to construct the ditch—working, however, only on occasional days upon it, so that up to about the fifteenth of May, A.D. 1860—six months after the notice was posted, and at the time when the last work was done by them—only about fifteen or twenty days' work had been done ; Black testifying that all the work done upon the ditch, up to that time, could have been done by one man in five or six days— whilst Eastman testifies that fifteen or twenty days' work had been done upon it. However that may be, nothing was done by them

but the digging of an irregular ditch, running between the point where the notice was posted and the rocky bend — a point just above the defendant's mill site. As there was nothing in the notice indicating an intention to claim any land for any purpose whatever, so we are perfectly satisfied, from the testimony, that nothing was done at the time towards appropriating any, except the digging of the ditch. Eastman, who was a witness for the defendant, testified that he *thought* they claimed some land; but what quantity, or where it was located, seems to have utterly escaped his recollection. The defendant can hardly expect to derive much advantage from a claim, the locality of which cannot be determined by the locators themselves. But Black and Eastman both testify that they intended at some time or other to build a mill; and that the water was claimed and the ditch dug with that object in view; and it is claimed by defendants that it was the intention to erect the mill upon the site now occupied by it; that a monument of stones was placed by Black and Eastman at that point. The evidence, however, does not show when the stones were placed upon the ground— whether before or after DeGroot's survey, and it cannot be presumed that it was before. Admitting, however, that Black and Eastman intended to claim the premises in dispute, and that the monument of stones was placed there by them prior to DeGroot's claim, still, it cannot be held that a few stones thrown together would give a person actual possession of a tract of land as large as that claimed here, or indeed of any quantity whatever. It must be borne in mind, that the digging of this irregular ditch, of which no use whatever had ever been made, or attempted to be made, and through which no water had ever run, except during the season of high water in the river, and the piling of a few stones together at some distance below the lower end of it, is all that had been done by Black and Eastman, when DeGroot entered and made his claim. And all this, except perhaps throwing up the monument of stones, was done by the middle of May; and everything remained in that condition, with nothing further being done until the twentieth of October, when DeGroot's survey was made. Black and Eastman were not living on the premises, nor had they any definite purpose with respect to the use of the ditch, or as to

when, if ever, they would make use of it. Eastman says that the object in doing what work was done, was to show that they had a claim; that they intended some time or other to build a mill, and so make use of the ditch. Were these acts—that is, the digging of the ditch and the piling up of the monument of stones, sufficient under the law to give Black and Eastman actual possession of the land here claimed? This question involves the entire merits of the case.

We admit that the argument of counsel for appellant against the validity of Johnson's claim is perfectly satisfactory, but the same argument and the same authorities relied on apply with equal force to the title of Black and Eastman, and to our mind, as completely overthrow and destroy it.

What acts of dominion over public land will, independent of statutory regulations, be sufficient to give a right of possession as against one subsequently entering; or rather, what character of possession of public land is necessary to be shown to enable a claimant relying solely upon possession to recover in ejectment, has perhaps more than any other question received the attention of the Courts of California and this State; and it may be safely said that it has been uniformly held by them that the possession must be an actual occupation, a complete subjugation to the will and control, *a pedis possessio*. The mere assertion of title, the casual or occasional doing of some act upon the premises, or the bare marking of boundaries, have never been held sufficient, after the lapse of a sufficient time to enable the claimant to make such enclosures or improvements as may be necessary to give him actual possession. We held in the case of *Staininger* v. *Andrews*, (4 Nev. 59) that while a person claiming public land was diligently prosecuting such work as might be necessary to subject it to his dominion or control, he should be deemed in the actual possession as against all persons entering within his marked boundaries and ousting him. Except in such cases, the Courts have uniformly held that nothing but prior actual occupation or possession will be sufficient to authorize a recovery in ejectment, when possession alone is relied on. Thus in *Murphy* v. *Wallingford*, (6 Cal. 648) it is said: "Possession is presumptive evidence of title, but it must be an actual *bona fide*

occupation, a *pedis possessio*, a subjection to the will and control, as contradistinguished from the mere assertion of title and the exercise of casual acts of ownership. A mere entry without color of title, accompanied by a survey and marking of boundaries is not sufficient." So in *Garrison* v. *Sampson*, (15 Cal. 93) Mr. Justice Baldwin speaking for the Court reiterates the rule in this manner : " The land is public land. It was not taken up by the plaintiff under the Possessory Act of this State, nor was it enclosed. There were a house and a corral on it. Of these he may be said to have been in the actual occupancy. But we cannot see from the proof any right of possession to the whole of the quarter section, or even any claim to it. We do not understand that the mere fact that a man enters upon a portion of the public land and builds or occupies a house or corral on a small portion of it, gives him any claim to the whole subdivision, even as against one entering upon it without title." Again, in *Coryell* v. *Cain*, (16 Cal. 573) it is said : " And with the public lands which are not mineral lands, the title as between citizens of the State, where neither connects himself with the government, is considered as vested in the first possessor and to proceed from him. This possession must be actual and not constructive, and the right it confers must be distinguished from the right given by the Possessory Act of the State. That Act, which applies only to lands occupied for cultivation or grazing, authorizes actions for interference with or injuries to the possession of a claim, not exceeding one hundred and sixty acres in extent, where certain steps are taken for the assertion of the claim and to indicate its boundaries. Parties relying upon the rights conferred by this Act must show a compliance with its provisions. They can thus maintain their action without showing an actual inclosure or actual possession of the whole claim. But when reliance is placed, not upon this Act but upon possession of the plaintiff, or of parties through whom he claims, such possession must be shown to have been actual in him or them. By actual possession is meant a subjection to the will and dominion of the claimant, and is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property." See, also, the cases referred to in *Stain-*

*inger* v. *Andrews, ante.* Indeed, that the possession, when that alone is relied on, must be actual and complete, is an expression stereotyped in all cases where this question is discussed, and each succeeding case only serves to strengthen and illustrate the rule. This question has been repeatedly submitted to, and considered by this Court, and it seems impossible to define the requirements of the law, or specify with more clearness or precision the elements of a good possessory title than has already been done in the decisions above referred to.

Tested by the rule announced and exemplified in these cases, had Black and Eastman the actual possession of the premises in dispute at the time DeGroot entered ? Most certainly they had not. Here was nothing done for a period of eleven months but the digging of an irregular and utterly useless ditch in a boundless waste of unclaimed lands ; apparently without a purpose, never used ; dug, not with a view to immediate use, but only as the parties themselves testify, to show that they claimed a water privilege, and only diverting water from the river during the season of high water, with nothing but a small monument of stones at some distance from it to indicate an intention to claim any land. In this condition everything remained for a period of five months without a solitary act being done, and probably the parties themselves not having placed foot upon the soil here claimed during that period, when the grantors of the plaintiff entered. The ditch was certainly not dug for the purpose of marking the boundaries to any claim of land, nor to indicate that an appropriation of any was intended by the parties. It was unquestionably dug simply for the purpose of diverting water from the river ; where or how it was to be used is not stated in the notice, and it will also be observed that no land, but only a " right of way " for the ditch, is claimed. The land upon each side of the ditch could without the least conflict with the intention of Black and Eastman, as expressed in their notice, have been appropriated by others. This ditch, then, should be considered simply as an act performed for the purpose of appropriating water, and as such was its immediate purpose, it should give the persons digging it no other right. An act by which water alone is appropriated, should not be considered an act for the appropriation of

land.   Land is appropriated by one character of acts, water by another.

It would be as absurd to say that the digging of a ditch is an appropriation of land sufficient for a mill site, as to say that to appropriate a mill site would be an appropriation of water for milling purposes.   It would hardly be claimed, if Black and Eastman had simply appropriated a mill site, that they could by such appropriation claim also that they had appropriated such quantity of water as they might need for milling purposes.   What good reason is there for claiming that the digging of a ditch for the purpose of diverting water from the river was an appropriation of a mill site? The ditch, if completed within a reasonable time, might have given a right to divert the water as against subsequent claimants—it could give nothing more.   This is all that was claimed in the notice, and all that seems to have been attempted to be secured.   Admitting, however, all that can be claimed for this ditch, that its immediate purpose was to secure the possession and control of the tract of land here claimed, still it would be impossible, under the decisions, to hold that Black and Eastman were in the actual possession or occupation of it when DeGroot entered.   No person going upon the premises could by the most diligent search have ascertained what was claimed.   No boundaries were marked, no improvements were to be seen, no use whatever was being made of the land, nor any indication that there was any intention ever to do so.   Did a few stones thrown together place these persons in actual possession of a tract of land nine hundred feet in length by seven hundred feet in width?   If so, why might they not, by the same monument, claim an indefinite quantity?   Their claim was bounded only by their desires or necessities.   We can see no more reason why such a monument, with a ditch not on the premises, should give actual possession of a mill site, than of a hundred and sixty acres of land. We conclude that in October, when DeGroot entered, Black and Eastman were not in the actual possession of the premises here claimed, and therefore that the land was vacant and subject to appropriation.   But the defendant also relies upon a title acquired from a company called the Mineral Rapids Company, which, it is claimed, located this land in February, A.D. 1860, some months

prior to the DeGroot survey. This company, however, does not appear to have conveyed any land to the defendant. It claimed the right to use and divert the water of Carson River between certain points, as will be seen by the following notice, which was the foundation of the right here conveyed:

"Know all men by these presents, That we, the undersigned, claim all the water in Carson River embraced and being within the boundaries hereinafter described, to wit: Commencing at a point three hundred and sixty-four rods north of Keller's log house in Chinatown, by one hundred and twenty-six rods east; said point being on the north line of a tract of land located and surveyed by J. R. Sears and others; following said river up and embracing all the water in said river to 'a point known as Logan & Holmes' Quartz Mill, for the purposes and use of machinery or ditches, or for any other uses which we, the claimants, may choose."

The deed from the company to the defendant conveys all the water right and privilege located as above. This deed may have conveyed whatever right the Mineral Rapids Company may have acquired to the water of the Carson River, but we are unable to see how it conveyed the premises here in dispute. No land is described, nor does it appear to have been the intention to convey any. It is simply a deed of a water right and nothing more. But should it be conceded that it was the intention to convey this land, that it is included in the deed, then, we answer, the Mineral Rapids Company never acquired any right or possession whatever of it, and hence could convey no title.

It appears that at the time mentioned the company had a private survey made of a tract of land for a town site, which embraced the premises here claimed. But it is admitted that the company, knowing of Black and Eastman's claim, did not intend to interfere with their rights, nor make any claim adverse to them, and so relinquished all right to that portion of the land claimed in this action. In fact, they never claimed to be in possession of, or have any title to it. The balance of the survey tract was subdivided into lots, but this portion of it was not so plotted on the map, or subdivided as a part of the town site. All the evidence shows that the Mineral Rapids Company made no claim to this tract.

Not intending to claim it, and having made no improvements thereon, it can hardly be said that any title was acquired. Even if it was intended to make such claim, still the same objection may be urged to its title that is urged against Black and Eastman's, there was no actual possession of it. If it were possible for this company to acquire title to land which it did not intend to claim, still something more than intention was necessary to give it such title, or to place it in the actual possession of it against a subsequent claimant. As this portion of their survey was not subdivided, nor intended as a portion of the town site, it was certainly as necessary to inclose it and to make some use of it, as in any case. Without intending to be understood as holding that that portion of the land which was intended to be taken up for a town site should have been fenced, it was certainly necessary to inclose or make some appropriate improvements upon that portion of the land within the survey which was not intended for a town site. The subdividing, staking off, and sale of lots might possibly be deemed sufficient acts of dominion to constitute actual possession of a town site, but such acts could give possession of nothing beyond the limits of such acts, or the town lots themselves. With respect to the tract of land here claimed nothing was done by the company but to survey the outer lines. It remained in this condition, with no act of ownership exercised over it, from February to the time of DeGroot's entry, a period of about eight months. The survey made by this company, it must be borne in mind, was not in accordance with the Utah statutes, and had none of the elements of an official survey. Whatever may have been its right with respect to the town lots, it is clear beyond all question that the company had not the actual possession or occupation of this land: First, because it never claimed it; and, second, if it did it made no such improvements upon or inclosures of it as to give it the actual possession at the time of DeGroot's entry. The deed from it to the defendant, therefore, conveyed no right to the land here in controversy.

Whilst the land was thus unoccupied, with no visible evidence of any claim being made to it, except an irregular ditch and a small monument of stones, DeGroot, the grantor of the plaintiff, entered upon it, and in compliance with the statute law then in force, had

it surveyed by the County Surveyor; had the survey recorded, and obtained from the Surveyor a certificate of that fact. The law authorizing such survey, provided that " the County Surveyor shall within thirty days after completing any survey make true copies or diagrams of the same, and transmit the same to the Surveyor-General, and one to the County Recorder, and give a certificate of such survey to the person for whom it was made, describing the tract, block, or lot, and number of acres contained, *and such certificate shall be title of possession in the person or persons holding the same.*" The statute further declared that " one year shall be allowed to persons having land surveyed to inclose and fence the same, and on their failing to inclose said land within one year, their title to said land shall be nullified, and the land be common, and may be surveyed to any person applying for the same." From these two sections, composed with but little regard for the rules of English grammar, it will be seen that a certificate of an official survey was made " title of possession " for one year; that the person having such certificate was to be deemed in possession of the surveyed premises for one year, but not beyond that. After the expiration of the year the land could only be held by means of an inclosure. DeGroot obtained a certificate from the County Surveyor in accordance with this Act on the twenty-first of October, A.D. 1860, and within one year began to fence the land as required by the latter section above quoted. But whilst so engaged he was forcibly stopped by Black and Eastman, and himself and employés driven from the premises. For this reason the fence was never completed. Thus by a compliance with the law, so far as he could or was permitted, DeGroot acquired a title which entitled him to the possession of the land in dispute, as against all persons except the General Government. It is argued, however, against this title that the survey was not actually made by the County Surveyor, but by persons employed by him and acting under his directions. We see no merit in this proposition. It is true, the County Surveyor did not perform the manual labor of making the survey nor could that have been expected of him by the Legislature. It was made under his supervision and direction and he gave the proper certificate which under the statute constituted the title. It was an

official act in all its essential features. When duties of this kind are required to be performed by an officer it is not expected that the labor is entirely to be performed by him. If it be adopted by the officer as his act, and certified to by him as such, the law is virtually complied with. Another objection made to this DeGroot claim is that although he commenced to fence the land within the year, yet the fence which he commenced to build, even if completed, would not have been sufficient to give him actual possession of the premises. Counsel seem to think that Black and Eastman and the Mineral Rapids Company could have an actual possession, and be deemed in the occupation of the land without any inclosure whatever, or even marking the boundaries, but that the grantor of the plaintiff could not secure such possession even by complete inclosure. We can hardly think that counsel rely upon this point with much confidence in its merit. DeGroot had under the statute, one full year after the survey to inclose his claim. He began in good faith to comply with its requirements, but was forcibly prevented by the grantors of the defendant. It cannot be presumed in favor of those who by violence stopped the fencing, that it would not have been sufficient to answer all purposes. The presumption, if any can be indulged in, is that an inclosure in all respects sufficient would have been completed. If it were admitted that the fence, as it was being built, would not have been sufficient, still how is it to be known that if DeGroot had not been interfered with, he would not before the expiration of the year have made it complete, and of the proper height? The grantors of the defendant having ousted DeGroot before the expiration of the time limited for him to make an inclosure, cannot now be allowed to derive any advantage from his failure to comply with the law in this respect; nor is the defendant who is their grantee in any better position. The law permits no person to profit by his own wrong. So far as this case is concerned, then, the DeGroot title must be considered as good as if he had inclosed his land with a sufficient fence within the time limited by law. (*Alford* v. *Dewin*, 1 Nev. 207.) He has therefore the better title, and as the plaintiff claims from him we see no reason thus far why he should not recover.

The next question discussed in this case is that raised upon the Statute of Limitations, the defendant pleading an adverse

possession in itself for over five years. But we are satisfied this defense is entirely unavailing to the defendant, it being a foreign corporation, and hence not entitled to plead the statute. It having no existence within this State, and the Courts not having complete jurisdiction over it, is brought within the provisions of section twenty-one of the statute, which declares: " If, when the cause of action shall accrue against a person, he is out of the State, the action may be commenced within the term herein limited, after his return to the State ; and if after the cause of action shall have accrued he depart the State, the time of his absence shall not be part of the time limited for the commencement of the action." That foreign corporations, which may never have had a legal existence within the State, are included within exceptions or statutes of this kind, is a question now very firmly settled by the authorities. Thus, in the case of *Olcott* v. *The Tioga Railroad Company*, (20 New York, 210) the Court of Appeals, upon a very thorough consideration of the question, and full examination of authorities, came to the conclusion that a foreign corporation came within the provisions of a statute similar to ours, and hence could not avail itself of the bar of the statute. The Court concluded the discussion of the question in this language, every word of which is pertinent in this case : " The course of adjudications established by these cases authorizes us, I think, to carry out the obvious intention of the Legislature in the statute before us. We can see no motive which it could have had for discriminating in favor of a foreign corporation, or any indication of an intention so to discriminate. The language of the exception in the first branch of section twenty-seven is not in all respects congruous to the case of a corporation, but there is an incongruity nearly as great in applying the phrase ' returning into this State ' to a person who had never resided here ; and quite as great in accommodating it to the case of one who had died abroad, and who could not by any possibility return. If the consequence is that a corporation in another State or country cannot enjoy the advantage of our limitation, the same is true of a natural person domiciled abroad, and where circumstances prevent his coming within our jurisdiction. The policy of our law is, that no persons, natural or artificial, who are thus circumstanced,

can impute laches to their creditors or those claiming to have rights
of action against them in not prosecuting them in the foreign juris-
diction where they reside.    It was equitable and in accordance
with the policy of the law of limitations, that when the reason for
excusing the creditor from the use of diligence should cease by the
debtor coming into the State, the obligation to use diligence should
again attach.    In engrafting this policy upon the statute the Legis-
lature made use of general words, which, though adequate to de-
scribe a corporation, did not contain any language referring specifi-
cally to a debtor who could not by its Constitution pass from one
territorial jurisdiction to another."

It is, however, argued here, that even if section twenty-one does
include foreign corporations, its provisions have application only to
personal actions, that the section has no reference to and does not
apply to real actions accruing within this State.    It is not claimed,
nor indeed can it be, that there is anything in the language of the
section to authorize any such construction or limitation of its pro-
visions.    The language employed by the Legislature is as broad
and comprehensive with respect to the kind of actions to which the
section shall apply as need be, and as clearly includes real actions
as personal.    If it were the intention to restrict its provisions to
personal actions, it is reasonable to presume that appropriate lan-
guage would have been used for that purpose.    The Act in which
the section is found fixes the time for commencing all kinds of actions,
and section twenty-one certainly appears to make an exception to
the entire Act.    So far as the language of the section is concerned
there is no more reason for holding that it applies only to personal
actions than that it applies only to real actions.    But some weight
is given to the position of the section in the Act as favoring this
proposition.    It seems to us its position rather negatives any such
conclusion.    It is placed in position with sections that are unques-
tionably general in their character, evidently applying to all kinds
of actions.    Thus, section twenty declares, when, within the mean-
ing of the Act, an action shall be deemed commenced so as to take
it out of the statute, and unquestionably applies to all actions.
Section twenty-two is in express terms made applicable to personal
actions, and then section twenty-three is evidently a general sec-

tion, providing that when a person entitled to bring an action dies before the expiration of the time limited for the commencement thereof, the cause of action survives, an action may be commenced by his representatives after the expiration of that time, and within one year from the death. ⌄ The section's position in the Act certainly does not seem to favor the proposition of counsel for appellant.

It is true, in all cases for the recovery of the possession of land, an action might be brought against the agents by whom the possession may be held for the corporation. Such action, however, would be unavailing in determining the title or claim of the real party in interest. But even if it were, that is no reason why the Courts should place a strained and unnatural conclusion upon the plain language of the Legislature. The real claimant—the foreign corporation—is not within the territorial jurisdiction of the Courts of this State, although its agents may be; and this is the real reason why it has been deemed proper to provide, that when a cause of action has accrued against a person, the time of his absence from the State, where the plaintiff resides, shall not be computed in the period of limitation. This precise question was raised and passed upon by the Supreme Court of Indiana, in the case of *Lagow* v. *Neilson*, (10 Ind. 183) the Court holding that a section, substantially like section twenty-one of our Act, included real as well as personal actions. "It is contended," say the Court, "that this section was intended to apply to personal actions, and not to those for the recovery of real property. We are not inclined to adopt that construction. As contended, the concluding branch of the section should not be so construed as to allow the law of limitations of a sister State to be used here in regard to actions for the realty; and it may be that for the recovery of real estate, a party is never prevented from bringing his suit by the mere residence of any claimant or owner—still, these conclusions not being inconsistent with the very explicit language used in the first branch of the enactment, cannot be allowed to control it. The phrase 'shall not be competent in any of the periods of limitation,' evidently refers to all the periods of limitations definitely fixed by the statute—hence, there seems to be no room left for construction." ·

Robinson *v.* The Imperial Silver Mining Company.

Chief Justice Beatty, in the case of the *Chollar-Potosi Mining Co.* v. *Kennedy and Keating*, (3 Nev. 361) took a different view of this question; but that case was not decided upon this question, the Court not agreeing with the learned Judge in the opinion entertained by him—so, that case is not authority except so far as the opinion there expressed is concerned, which is certainly entitled to great weight; but we are compelled, upon a careful consideration of the question, to come to a different conclusion. The defendant could not therefore avail itself of the statute.

It is also argued, that the Court below erred in giving certain instructions at the request of the plaintiff, and in refusing to give others asked by the defendant. The second instruction given by the Court, and which it is claimed is incorrect, is in this language : " Under the laws of the Territory of Utah, in force during the year 1860, the certificate of the County Surveyor, of his survey of land to the person for whom it was made, describing the tract surveyed and number of acres contained, was the title of possession thereto to the person or persons holding the same for the period of one year, without making any improvements upon the land ; and such right and title continued without inclosing or fencing, or otherwise improving the same as against any and all persons preventing such fencing and their grantees and successors in interest." The objection urged to this is, that no exception is made of such lands as might be occupied at the time said survey was made ; that the title given by reason of such survey could only be of land unoccupied at the time it was made. That a survey could give no title as against persons in the actual possession, when made, may be admitted ; but we have shown that neither Black or Eastman, nor the Mineral Rapids Company, were in the actual possession of the land in dispute at the time DeGroot had his survey made ; that it was, in fact, vacant land ; the failure therefore to incorporate an exception with respect to occupied land, in the instruction, could not possibly have injured the defendant. Hence, the giving of the instruction was not an injury of which it can complain, as such instruction could not have misled the jury to its prejudice. However, we are satisfied that the first instruction given was incorrect ; but it is also perfectly evident, that the verdict is correct, and sup-

ported by the undisputed facts of the case. Had it been against the plaintiff, it would have been clearly contrary to the evidence. Such being the case, it should not be disturbed.

The rule, we think, is well settled, that a verdict which is undoubtedly right upon the evidence—that is, when so clearly right that if it were the other way it would be considered contrary to the evidence—should not be set aside because of the admission of improper evidence, or the giving of incorrect instructions. (1 Grah. & Waterm. on New Trials, 301; 2 Grah. & Waterm. on New Trials, 634; *Levetzky* v. *Corning*, 33 Cal. 299; *Pico* v. *Stevens*, 18 Cal. 376; *Fleeson* v. *Savage Co.*, 3 Nev. 157.)

The judgment of the lower Court is affirmed.

On petition for rehearing—By the Court, Lewis, C. J. :

The conclusion reached by us in our former opinion in this case was the result of very careful examination of a very voluminous record, and a no less careful examination of the legal principles announced. We are perfectly satisfied that the conclusion thus obtained is correct, upon the questions made by counsel and discussed by the Court.

Other grounds, however, are now taken, and a rehearing is asked principally upon points not made on the original argument, nor considered by the Court; but we have found nothing in the petition to shake our convictions as to the correctness of our former opinion. As we consider it unnecessary to enter into a full discussion of all the points made upon the petition, we will content ourselves with briefly stating our answers to each point as made by the appellant; and, first, it is argued that the Utah statute, which authorized the survey of unoccupied public lands, and declared that the Surveyor's certificate of such survey should " be title of possession to the person or persons holding the same," was simply remedial in its nature, and as it has been repealed no rights can be claimed under it.

To this it is only necessary to say, that the law gave to the certificate, obtained in accordance with the provisions of the law, the character of a title as to all save the General Government. The law having been complied with, and the title obtained under it, the repeal of the law cannot destroy the title so acquired. It became

a perfect and vested right, so far as the law and DeGroot's compliance with it could make it so before the repeal.

It is next objected, that it was not shown that the County Surveyor made a copy or diagram of the survey, and transmitted it to the Surveyor-General, as required by the law already referred to. The Act, it is true, imposed that duty upon the County Surveyor, but we doubt very much if the failure on the part of that officer to discharge it would deprive the holder of the certificate of the title of possession which it conferred upon him. Whether it would or not that point is not available here, for that objection was not made when the certificate was offered in evidence, and hence should not avail the appellant in this Court, because it may be very well said that the respondent might have been able to show that the copy was regularly filed with the Surveyor-General had the objection been made at the proper time. An objection of this kind which might be removed, if made at the trial, should not nor do the Courts allow it to avail the complaining party who raises it for the first time upon appeal.

Counsel will observe, that whatever may have been said in the case of *Grosetta* v. *Hunt,* with respect to the necessity of filing a copy of the survey with the Surveyor-General, was not the decision of this Court, as a majority of the Judges did not concur in what was said upon that point. It is also objected that the certificate was not filed with the County Recorder, an omission which by the law itself is made fatal to its validity. To this it may also be answered, the certificate was not objected to in the Court below upon that ground. But we find as a matter of fact that it was regularly filed, as appears by the indorsement upon it: "Filed November 17th, 1860." Signed by the Recorder.

True, the further indorsement is made, that it was recorded, on the twenty-ninth of the same month. This recording of the instrument, which was a useless act, could not certainly vitiate the filing which was made in accordance with the requirements of the law, nor yet is there any evidence in the record to justify the conclusion of counsel that the instrument was simply filed for record. It is not so stated in the file marks, nor is there any other proof tending in that direction. We cannot presume in direct opposition to

the indorsement on the certificate that it was not filed as the law required.

Again, it is argued, that it does not appear the certificate was recorded in the County Surveyor's office, the law of 1855 seeming to require this to be done by the Surveyor. But, like the other objections to this paper, this is now made for the first time. Yet, there is another answer to it. The same section which requires such record declares expressly that " no certificate shall be valid unless *filed in the Recorder's office,* as provided for in this Act." It must be presumed by all rules of construction that the omission to do any of the other acts imposed by the section would not render the certificate void. To expressly make it invalid if one of several acts required to be done was omitted, authorizes the presumption that it was not the intention of the Legislature to invalidate it if any of the others were neglected to be performed.

The last objection to the certificate is, that it does not state " to whom it was given." This is also a new point; still we find that the certificate does state that the survey was made for DeGroot, which is a sufficient compliance, if indeed a compliance with the law in this particular were at all necessary.

Counsel next enter into a discussion of the evidence and merits of this case, and the instructions given and refused. These were fully considered in our former opinion, and we find nothing in the petition to occasion a change of our views. It is possible that some minor facts were misstated in that opinion, but we find upon a reëxamination that all the material points of evidence were correctly related. It is, therefore, deemed unnecessary to further discuss the fourth point of the petition for rehearing.

Upon the proposition that the defendant acquired a right to the water by prescription, it is sufficient to say that no such defense was made in the answer, nor in any way suggested upon the trial of the case.

The rehearing is denied.

JOHNSON, J., did not participate in the foregoing decisions.