## VALCALDA et al. v. SILVER PEAK MINES.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1898.)

No. 373.

1. MINES AND MINING—MILL-SITE CLAIM—EJECTMENT—EVIDENCE.

In ejectment to recover a mill-site location connected with a mining claim, to which no patent has issued, where complainant relies upon his own prior possession and an ouster by defendant, a receiver's certificate to the plaintiff for the purchase money of the land is admissible in evidence, not as showing title, but as tending to show, in connection with other evidence, the good faith of the plaintiff, pursuant to its location and survey. 79 Fed. 886, affirmed.

2. SAME—EJECTMENT—SUFFICIENCY OF POSSESSION.

It is a sufficient possession of a mill-site claim to maintain ejectment therefor that its corners are marked with painted posts, as is the custom in locating such mill sites, and that the claimant had a house and stable thereon, and had constructed tunnels to increase the flow of springs, and built a wagon road to his mines, thus indicating a present and continuous use. 79 Fed. 886, affirmed.

In Error from the Circuit Court of the United States for the District of Nevada.

This was an action of ejectment by the Silver Peak Mines against Giovanni Valcalda and others to recover possession of a mill site

located in connection with a mining claim. In the circuit court judgment was given for plaintiff, and the defendants have sued out this writ of error.

Robert M. Clarke, for plaintiffs in error.

M. A. Murphy, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. On the 1st day of October, 1888, the Silver Peak Mines, a corporation, by its attorney in fact, located the Crown mine, and at the same time located five acres of land, not contiguous thereto, as a mill site, under the provisions of section 2337 of the Revised Statutes of the United States, which provides as follows:

"Where non-mineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such non-adjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith, subject to the same preliminary requirements as for survey and notice as are applicable to veins or lodes; but no location hereafter made of such non-adjacent land shall exceed five acres, and payment for the same must be made at the same rate as fixed by this chapter for the superficies of the lode."

In the location notice of the mill site, claim was made to all the waters running from the two springs situated thereon. The notices of the location of the mine and the mill site were posted, the one on the mining claim, and the other on the mill site; and both notices were recorded in the records of the Silver Peak and Red Mountain mining district; and thereafter copies of said notices were recorded in the records of the county recorder for Esmeralda county. During the years 1888 and 1889 work was done and money was expended by the corporation upon its mine, and a tunnel was run on the mill site for the purpose of increasing the supply of water from the said springs; and in the year 1889 a survey both of the mine and the mill site was made for the corporation by a United States deputy mineral surveyor, and posts were numbered and marked and placed at each corner of the mill site by the surveyor. Thereafter work was performed by the corporation in cleaning out the said springs, and increasing the supply of the water. Application was made by the corporation to the government of the United States for a patent; and on February 13, 1890, final proof and payment was made for the land embraced in the Crown lode mine and mill site. Long prior to the date when the mill site was located, the land included in the application had been occupied by the locator's predecessors in interest; and a house, a stockade stable, and a corral had been built upon said premises, and a road had been graded therefrom to the mines of the corporation, at a cost of between ten and fifteen thousand dollars. From the time of its location of said mill site, the corporation had made use of the water of the springs by hauling it in wagons a distance of four or five miles, for use at the mines, for its employés, and for culinary purposes. The only way in which mine owners in that vicinity could obtain water for use in their mines was by hauling it or packing it from springs, and it was the custom of miners in that district to locate springs of water in connection with their mines. In March, 1896, the corporation began an action of

ejectment against Giovanni Valcalda and others, the plaintiffs in error, alleging that on March 16, 1896, the defendants had ousted the plaintiff from the premises included in the mill site. The defendants answered, denying the plaintiff's title and right of possession, and denying the plaintiff's right to the spring or the waters thereof, and alleging that the defendant Giovanni Valcalda owned the land upon which the spring rises, and that he had appropriated the water of the spring for mechanical, stock, and domestic purposes. Upon the issues thus formed, the plaintiff in the action had a verdict and judgment for possession of the premises and the springs of water situated thereon.

Upon the writ of error from this court, it is assigned as error, first, that the court admitted in evidence the duplicate receipt for the purchase money of the Crown mill site, offered by the plaintiff. It is contended that the receipt for the purchase money did not vest the legal title in the plaintiff, and that it was not sufficient to enable it to recover in ejectment. To this it is sufficient to say that the record shows that the receipt was not offered or admitted in evidence for the purpose of proving title in the plaintiff, but was offered and admitted in connection with the other evidence, as tending to show the good faith of the plaintiff in its possession pursuant to its location and its survey, by proving that it subsequently posted notice of its intention to apply for a patent, and paid in good faith the purchase price of the land embraced in the claim. The charge of the court to the jury expressly directs their attention to the purpose for which this evidence was admitted, and for which they might consider it. There was no error in admitting it for that purpose. Neither party claimed that it had acquired the title of the government, nor did either in any way connect itself with that title. The questions at issue were whether the plaintiff had been in the possession of the premises, and whether the defendants had ousted it therefrom. The receiver's receipt was evidence only of possession by the plaintiff, in connection with other evidence thereof, and the jury were not permitted to consider it as evidence of a right of possession.

These considerations are applicable to the next two assignments of error, which are—First, that there was error in admitting in evidence an application of one of the plaintiff's grantors to purchase from the state of Nevada the land in controversy, together with the receipt for the purchase money and the deed of such grantor to the plaintiff; and, second, that there was error in excluding the defendants' proffered proof that the certificate of purchase and duplicate receipt issued by the land office to the plaintiff for the mill site had been canceled. The papers so admitted showing a conveyance from the plaintiff's predecessor were admitted solely as tending to prove possession. The plaintiff was making no claim of title through its receiver's receipt, and the fact that that instrument had been canceled had no bearing upon the questions in issue. It having been expressly admitted by both parties to the suit that neither party connected itself with the government title, the plaintiff was left to recover, if at all, upon the fact that it had been in the possession of the premises when ousted by the defendants. The action of the officers of the general land office

could not affect the real question in issue. Its decision was not a judgment that the plaintiff had no right of possession. It was no more than an adjudication against the validity of the steps which it had taken to procure the title from the United States. It was not decisive of its right to remain in the possession or to take further steps to procure the title if it saw fit to do so.

The real question in controversy in the case concerns certain instructions which were given and refused to the jury. The court charged the jury as follows:

"It is not necessary that the land in controversy, which has been designated as the 'Crown Mill Site,' should be inclosed with a fence, or that it should be reduced to cultivation, to constitute possession. If you believe from the evidence that there was a house, stockade stable, and corral on said land, erected by the plaintiff in this action, or those from whom they derived possession of the premises; that plaintiff, at diverse times, improved the springs upon said land, and in 1888 or 1889 made a claim to said land for five acres of land, and the water flowing from said springs on the land, as a mill site and water right; that it caused the land to be surveyed, and posts were erected at each corner of the land, indicating the corners and boundaries thereof, and continued in first possession thereof, until ejected by defendants, if they were ejected, so as to subject the land to its control, and to notify the public that the land was claimed and occupied, this would constitute a possession of the land."

Upon a careful consideration of the question, we find no error upon the part of the court in so instructing the jury. The property was used by the plaintiff in connection with its mining claim. It had been located as a mill site. It was not located on mineral land, it is true, nor was it contiguous to the mining claim; but it had been located pursuant to the custom of miners in a district in which the mines were generally situated in an arid region, and it was necessary to obtain a supply of water from springs located in the foot hills, generally at considerable distances from the mines. The premises in question were clearly necessary to the proper operation of the plaintiff's mines. They were as much used for mining purposes as if they had been used for a dumping place for tailings or as a site for mill machinery. In Hartman v. Smith, 7 Mont. 19, 14 Pac. 648, it appeared that a mill site had been located on nonmineral land, not contiguous to the lode, but distant therefrom a distance of two miles and a half. The only improvement made on the land was the erection of a log cabin, in which the shovels, picks, drills, powder, tools, and small quantities of ore from the mining claim were stored. The court held that this use was a use for mining or milling purposes under the statute, and that, having been so used, it was not abandoned or forfeited, notwithstanding the fact that it was put to no other use. The evidence contained in the record now before us does not show that the corporation was not in the actual possession and use of the premises up to the time of the ouster. The bill of exceptions on this branch of the case states only that there was testimony in the case tending to establish the fact that in 1891 the defendants, without obtaining the consent of the plaintiff, finding the cabin on the mill site vacant and unoccupied, and the stable vacant, and no person upon the premises, entered peaceably thereon, made improvements, claimed and used the water from the spring for domestic purposes, and thereafter remained in such possession and use;

but it is not said in the bill of exceptions that there was not evidence contradicting all this testimony, and tending to show that the plaintiff's possession was such as is indicated in the charge to the jury.

That one who is in the actual possession of public land may maintain ejectment against another, who ousts him of that possession, has been well settled by repeated adjudications; but it has never been held that one in the possession of public lands, not mineral lands, who does not connect himself with the title of the government, can maintain ejectment against one who has acquired the possession, unless he shows that his own possession was actual, and not constructive. The mere assertion of title, together with an occasional act of dominion over the premises, or the marking of the boundaries, are ordinarily not sufficient. Staininger v. Andrews, 4 Nev. 59.

In Murphy v. Wallingford, 6 Cal. 648, it was said:

"Possession is presumptive evidence of title, but it must be an actual bona fide occupation, a pedis possessio, a subjection to the will and control, as contradistinguished from the mere assertion of title and the exercise of casual acts of ownership. A mere entry, without color of title, accompanied by a survey and marking of boundaries, is not sufficient."

In Coryell v. Cain, 16 Cal. 573, the court said:

"And, with the public lands which are not mineral lands, the title as between citizens of the state, where neither connects himself with the government, is considered as vested in the first possessor, and to proceed from him. This possession must be actual, and not constructive; and the right it confers must be distinguished from the right given by the possessory act of the state. * * * But when reliance is placed, not upon this act, but upon possession of the plaintiff, or of parties through whom he claims, such possession must be shown to have been actual in him or them. By actual possession is meant a subjection to the will and dominion of the claimant, and is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property."

Said the supreme court of Nevada in Robinson v. Mining Co., 5 Nev. 68:

"Indeed, that the possession, when that alone is relied on, must be actual and complete, is an expression stereotyped in all cases where this question is discussed."

The question, then, arises, what is actual possession as applied to a case such as that now under consideration? It is clear from an examination of the authorities that actual possession may be evidenced in various ways. It is always actual when it is an open and visible occupancy. The occupancy may be evidenced by an inclosure. In such a case it is ordinarily limited to the inclosure, and is not extended to the premises beyond it. It may be evidenced by other improvements, or by actual and visible use. In the case under consideration there was no inclosure, nor was there a personal residence upon the property. In some cases, one or the other of these indications of possession would be held to be essential. But regard must always be had to the nature of the premises and the purpose for which they are occupied. It would seem that a tract of five acres claimed for a mill site, as this was, may, in general, be said to be in the possession of the locator when its corners are marked with painted posts, as is the custom and rule in locating such mill sites, and as required by the regula-

tions of the general land office. In a mining country the presence of the boundary posts is as significant of occupation as an inclosure would be of agricultural lands. In the present case there were, in addition to the boundary posts, the house, the stable, and the springs, together with the tunnels recently constructed to increase the flow of water, and the graded wagon road leading from the mill site to the mines of the plaintiff, all indicating a present and continuous use. In view of all these evidences of open and visible occupation, we cannot say that the court erred in charging the jury as it did. Nor do we find error in the refusal of the court to instruct the jury, as requested by the defendants, as follows: "When land is located for a mill site or for milling purposes, the party locating and claiming the same must, within a reasonable time, use the land for the purpose for which it was located." There is no requirement in the statute such as is contemplated in this request for instruction, nor have the courts so construed the law. Failure to use a mill site for the purpose for which it is located may, indeed, become evidence of abandonment; but there was no evidence, so far as the record goes, tending to show that the locator had failed or ceased to use the property for the purpose for which it was claimed. The statement in the bill of exceptions that there was evidence tending to show that the defendants had entered upon the premises, finding them vacant, is not inconsistent with such continuous use by the plaintiff. It is not intimated that, notwithstanding this entry upon the premises, the locator intermitted its use of the premises and of the water right, so as to indicate abandonment, or that it ever intended to abandon the mill site. It is well settled that lapse of time does not of itself constitute an abandonment, and that it is only a circumstance for the jury to consider in determining the question whether there has been an abandonment. In other words, the question is one of intent. Said the court in Waring v. Crow, 11 Cal. 369: "The intention alone governs." Keane v. Cannovan, 21 Cal. 293; St. John v. Kidd, 26 Cal. 272. In Richardson v. McNulty, 24 Cal. 345, it was said: "By the act of occupancy, the plaintiff made it his, and manifested his intention to do so. Once his, it continues his until he manifests his intention to part with it in some manner known to the law." In Moon v. Rollins, 36 Cal. 337, it was held that one in possession of land might leave it for a period of five years if he had the intention of returning, and that his mere failure to occupy the land for that period does not necessarily constitute an abandonment.

We find no error for which the judgment of the circuit court should be reversed, and it is therefore affirmed.